UNITED STATES of America, Appellee,

v.

Robert CAPO, Tadeusz Snacki, a/k/a "Ted Snacki", and Walter Snacki, Defendants-Appellants.

Nos. 409, 421, Dockets 85–1290, 85–1291.

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1986.

Decided April 24, 1987.

Ronald S. Carlisi, Rochester, N.Y., for defendant-appellant Capo.

Norman Palmiere, Rochester, N.Y. (Palmiere & Pellegrino, P.C., of counsel), for defendant-appellant Tadeusz Snacki.

Rosemary G. Roberts, Rochester, N.Y., Asst. U.S. Atty., W.D.N.Y. (Roger P. Williams, U.S. Atty., W.D.N.Y., of counsel), for appellee.

Before FEINBERG, Chief Judge, KAUFMAN, OAKES, TIMBERS, MESKILL, NEWMAN, KEARSE, CARDAMONE, PIERCE, WINTER, PRATT, MINER, ALTIMARI, and MAHONEY, Circuit Judges.

## ON REHEARING IN BANC

GEORGE C. PRATT, Circuit Judge, joined by FEINBERG, Chief Judge, IRVING R. KAUFMAN, OAKES, MESKILL, JON O. NEWMAN, CARDAMONE, PIERCE, WINTER, MINER, ALTIMARI, and MAHONEY, Circuit Judges:

Defendants were convicted in the United States District Court for the Western District of New York, Michael A. Telesca, *Judge*, for conspiring to violate and for substantive violations of the Hobbs Act, 18 U.S.C. § 1951, as well as for various false statement, witness tampering, and obstruction of justice counts. A divided panel of this court affirmed those convictions, *United States v. Capo*, 791 F.2d 1054 (2d Cir. 1986), and, following a poll of the active judges of the court, the Hobbs Act convictions were reheard in banc. The point of demarcation between the panel majority and dissent concerned the applicability of the Hobbs Act to the facts of this case. While the panel majority held that the underlying job-selling scheme fell within the bounds of traditional Hobbs Act jurisprudence, it is the majority position upon rehearing that, without sufficient evidence to establish the requisite elements of extortion by wrongful use of fear of economic loss, defendants were improperly convicted under the federal extortion statute.

While this rehearing of the Hobbs Act counts bears little practical consequence for defendants—they remain convicted of the false statement, witness tampering, and obstruction of justice counts, for which their sentences are concurrent with their Hobbs Act sentences—we nonetheless must exercise our responsibility to ensure that federal criminal statutes are not enforced in a manner inconsistent with congressional intent. Because congress did not intend federal intervention in this factual setting, we vacate the decision of the panel majority on the Hobbs Act counts, and reverse defendants' Hobbs Act convictions.

## BACKGROUND

The Eastman Kodak Company ("Kodak"), which has its headquarters in Rochester, New York, is a major economic force in upstate New York. The job-selling scheme underlying these convictions took place at Kodak's Elmgrove plant, one of the company's primary manufacturing facilities, where approximately 13,000 people were employed at all times relevant to this appeal. Early in 1981, John Baron, an unindicted co-conspirator, was hired as an employment counselor in Kodak's Industrial Relations Department. One of Baron's first responsibilities was to hire a group of

permanent production employees. As directed, Baron initially hired approximately 1,400 people who had previously been laid off at Kodak, after which he followed standard Kodak procedure for hiring the remainder of the needed permanent production employees.

The primary tool at a Kodak employment counselor's disposal consisted of an accumulated file containing approximately 55,000 applications. The hiring process was designed so that when a job requisition was filed, the counselor would review the relevant applications and hire, based upon, among other considerations, prior experience, prior service with Kodak, and length of time the application had been on file. In reality, however, the hiring that gave rise to these prosecutions did not, and probably could not, follow this carefully considered format; in addition to the turnover caused by normal attrition in a large work force, employment counselors at Kodak were called upon episodically to conduct "supplemental" hirings.

In 1982, Kodak announced the supplemental hiring of approximately 2,300 people needed to commence production of the company's new "disc camera". According to Baron, the standard application system, which at its best was inefficient, collapsed under the dramatic demand to hire these new, temporary employees immediately. Baron's boss, Mr. Seils, testified that, in addition to the standard application system, Kodak had long used an internal job referral system through which department heads and other supervisors would submit lists of names of prospective applicants they wished to see hired. Seils further testified that, in the rush to satisfy the hiring needs created by the disc camera production, the referral system became the primary means of hiring, as it was far more efficient than the standard application mechanism. Indeed, even with the referral system, Baron characterized the disc-camera supplemental hiring as "out of control", indicating that people could have walked off the street without previously applying and nevertheless been hired.

It was in this hectic setting of the disc-camera supplemental hiring that the instant job-selling scheme took hold. Baron's friend, Kodak supervisor Stanford Forte, Sr., referred several people to Baron, including defendant Tadeusz Snacki ("Ted"), and Ted's wife and nephew. For hiring them, Baron was rewarded with a leather coat and a color TV. Thereafter, Forte gave Baron a VCR and asked Baron to hire three other people. When Baron again complied, Forte shared $1,500 with Baron that Forte had received from the three referrals. The following month, Forte prevailed upon Ted Snacki to help Baron move, and during the move, Baron agreed to hire Ted's son. One month later, Ted, who had not known Baron before Forte introduced them, gave Baron a wedding gift of $400.

At the same time these deals were being made, the job-peddling scheme spread to others. Ted's brother, Walter Snacki ("Walter"), an employee of another company, Rochester Products, embarked upon a string of referrals for money, all of which resulted in Kodak employment for the payors. Walter passed the word to a number of co-workers at Rochester Products that he could assure that they or their relatives or friends would be hired at Kodak for the payment of $500, or, in one case, of $600.

For example, Walter was overheard by a co-worker, Josephine Kane, discussing with another fellow employee his connection at Kodak. Kane asked Walter if he would get her husband, William, a job. Walter told her that he would see, and sometime later told Kane he could do it for $500. Kane gave Walter her husband's application, on which she had been instructed to leave the date blank, but said she would not pay until William had been hired. Shortly thereafter, her husband was offered a job. Even though William Kane turned down that first offer of employment, Walter was able to secure for him a second offer some months later after William had reconsidered, although on that occasion Walter demanded that the money be paid in advance.

The exchange upon which the panel majority placed greatest emphasis transpired between Walter and Paul Kelso, another Rochester Products co-worker and Walter's friend. Kelso wanted to separate from his wife, Marjorie Ann, but with two children and his wife unemployed, it was not then economically feasible. Although Marjorie Ann previously had applied to Kodak on her own, she had not been successful. Walter informed Kelso that he could get a job for Marjorie Ann for $500. When Kelso balked at having to pay, Walter responded: "You want her to get a job, don't you." Once Kelso agreed to pay, Marjorie Ann was hired.

Through the Snackis' connection with John Baron, Walter secured employment at the Elmgrove plant not only for William Kane and Marjorie Ann Miller-Kelso but also for several other relatives of Rochester Products employees. Among these were Rita La Delfa and Vivian Pfund, two daughters of Antonina La Delfa, a janitor at Rochester Products, both of whom paid $500 to Walter and both of whom were subsequently hired. Similarly, Peter Riccardi's and Robert Drelick's wives were both hired at Kodak after Walter received $500 and $600, respectively. Josephine Kane again invoked Walter's assistance on behalf of her sister, Carmella Angora; however, although Josephine paid Walter $600, Angora was never hired because by that time news had leaked that the FBI was investigating job-selling at Kodak.

In addition to obtaining jobs for his own family members through the job-selling network, Ted, through his daughter, also received two $500 checks from Joseph Scavo to secure employment for Michelle Sofia, Scavo's friend, and Dawn Himmelsbach, Scavo's sister. Both women ultimately were hired. In addition, Scavo borrowed $500 to secure Joe Pascente a job at Kodak through Ted's connection.

The Snackis' job-selling network branched out to encompass Robert Capo, a local barber who was Ted's friend. Capo let it be known that he had a connection at Kodak, and, over time, used his influence to help several of his customers get jobs, including Robert Frechette, for $1,000; Peter Iascone, for $800; Iascone's friend, Sam DeLeo, for $1,000; Bernard Gauthier, for $800; and Bernard's son, Brian, also for $800. The evidence at trial also established that Capo got jobs for Joan Adams, the wife of his friend, James, for $700; Joseph Licata, for $1,000; and Daniel Boerst, the son of an acquaintance, for $1,000.

Because defendants' subsequent actions in attempting to derail the investigation are not involved in this in banc rehearing, the details of their activities concerning false statements, witness tampering, and obstruction of justice need not be recounted here. With respect to the extortion counts, all three defendants were convicted on one count of conspiring to violate the Hobbs Act; additionally, Walter was convicted on six substantive Hobbs Act counts and acquitted on one other, Ted was convicted on two and acquitted on one substantive Hobbs Act count, and Capo was convicted on five substantive Hobbs Act violations and acquitted on three others. Although indicted along with defendants, Forte pled guilty before trial, and unindicted co-conspirator John Baron testified for the government at trial.

The question before this in banc court is whether defendants' conduct, although likely a violation of state law, constitutes federal extortion. We conclude that it does not.

## DISCUSSION

The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. 18 U.S.C. § 1951(b)(2).

The government successfully prosecuted these defendants under the theory that their activities amounted to extortion by wrongful use of fear—specifically, fear of economic loss. *See, e.g., United States v. Rastelli,* 551 F.2d 902, 904 (2d Cir.), *cert. denied,* 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977). In response, defendants do not contend that a job-selling scheme

could never constitute extortion under the Hobbs Act. Rather, they protest that the money they received was not extorted from their "victims" because the "victims" were not induced to pay by fear of economic loss, but, instead, by hope—the hope of obtaining employment. In substance, defendants claim that the government cannot demonstrate wrongful use of fear of economic loss absent proof either that defendants threatened to impair the "victims'" prospects for employment at Kodak if they did not pay, or that the "victims" otherwise reasonably believed their chances for employment would be impaired for nonpayment. Thus, defendants argue that, unless we are willing to accept a melding of federal extortion and state-law commercial bribery, we must recognize the insufficient evidence of fear of economic loss on these facts.

## I. *Fear of economic loss.*

"The cases interpreting the Hobbs Act have repeatedly stressed that the element of 'fear' required by the Act can be satisfied by putting the victim in fear of economic loss." *United States v. Brecht*, 540 F.2d 45, 52 (2d Cir.1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977) (citations omitted). Instructing the jury in this case, the district judge charged:

> It is not necessary that the Government prove that the fear of economic loss was the consequence of a direct threat made by the defendant. Nor is it necessary for the Government to prove that the defendant actually created the fear in the minds of his victims, or was responsible for creating that fear. However, it must be proved that the defendant intended to exploit the fear of the alleged victim. The fear of economic loss must be a reasonable one. The mere voluntary payment of money or delivery of property, unaccompanied by any fear of economic loss, would not constitute extortion.
>
> In other words, if you find that any defendant asked for the payment of money as a pre-condition to his using his influence with officials at Kodak to ob-

tain a job for someone, that alone is not extortion.

> To find the defendant guilty of extortion, you must also find that the victim reasonably believed that the defendant had the power and influence with officials at Kodak to hurt the victim's prospects of obtaining employment at Kodak, even if that fear was not caused by a direct threat by the defendant, and that the victim was in fear of not obtaining a job, or of seriously reducing his chances of obtaining a job, unless he gave money to the defendant.

As the panel majority and dissent agreed on the propriety of this instruction, the issue on rehearing is whether there was sufficient evidence as a matter of law to establish the Hobbs Act violations.

### A. *The requirement of preclusion or diminished opportunity.*

■ The absence or presence of fear of economic loss must be considered from the perspective of the victim, not the extortionist; the proof need establish that the victim *reasonably* believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment. *See Rastelli*, 551 F.2d at 905. Here, although there is at least a serious question whether it would have been reasonable for the "victims" to believe defendants had the power to harm them, there is no evidence at all to suggest that it would have been reasonable for the "victims" to believe that if they did not pay, the defendants would exploit any such power to diminish their employment opportunities.

This circuit's case law on extortion by wrongful use of fear of economic loss is comprised of cases in which the evidence was plain that nonpayment would result in preclusion from or diminished opportunity for some existing or potential economic benefit. For instance, in *Brecht*, the evidence established that the defendant was the manager of Westinghouse's technical publications group, which position afforded him discretion to award outside subcontracts for the production of Westinghouse's technical manuals. At a meeting with a

subcontractor's representative, the defendant *"demanded* a $1,000 kickback *as a condition for the award* of the contract to [the subcontractor]." 540 F.2d at 47 (emphasis added). We affirmed defendant's conviction for extortion by wrongful use of fear of economic loss "since the evidence showed that he obtained the $1,000 by the use of fear, attempting to convince the victim that he *would be denied any chance* to obtain a contract *unless he paid." Id.* at 52 (emphasis added).

Likewise, in *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), we affirmed the conviction of a county political figure for extortion by wrongful use of fear of economic loss for exploiting the fear of an insurance agency that it would lose its position as broker of record for the county if certain kickbacks were not forthcoming. We rejected a challenge to the sufficiency of the evidence "[i]n light of the *overwhelming evidence that* the principals of the * * * [a]gency understood *the [a]gency would lose its position* as Broker of Record for Town and County *if it ceased making the payments specified". Id.* at 133 (emphasis added); *see also United States v. Clemente,* 640 F.2d 1069, 1073 (2d Cir.) (nonpayment would lead to loss of existing carpentry account), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); *United States v. Daley,* 564 F.2d 645, 650 (2d Cir. 1977) (failure to provide free supplies and labor to union official would lead to loss of jobs and labor unrest), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); *Rastelli,* 551 F.2d at 904–05 (failure of lunch truck suppliers to pay kickbacks to union official would lead to loss of union-members' business).

### B. *The evidence of fear here.*

■ The panel majority concluded that "[t]he evidence was adequate to allow a rational juror to find beyond a reasonable doubt that the victims reasonably feared economic loss if they did not make the payments demanded by the defendants." *Capo,* 791 F.2d at 1065. Recognizing the strict standard for viewing evidentiary suf-

ficiency—that the evidence must be viewed in the light most favorable to the government—we disagree and hold that the evidence of fear of economic loss was insufficient here as a matter of law. First, there was no evidence that any defendant did, in fact, negatively influence any hiring decision or even attempt to do so. When defendants did intervene in Kodak's hiring it was only to assist these "victims".

Furthermore, review of the trial transcript reveals that not one witness testified to any fear that nonpayment would result in one of the defendants adversely affecting his or her chances for a job at Kodak; indeed, most of the "victims" testified that they had no such fear, while the others simply were not asked. Instead, the evidence establishes that these "victims" were willing participants seeking to improve their chances. As Robert Frechette testified, after Capo offered to help him at Kodak for $1,000, he

> thought about it for a while. Went home; talked it over with my wife. And I said, "Seemed like a good deal." I mean, I was working through agencies anyways [sic] off and on and I was paying them, too.

Trial trans. at 386. Thus, the second part of the *Rastelli* test—that the victim reasonably believed that the defendant would exploit his power to the victim's detriment—is not satisfied here.

Further representative of the trial testimony of these "victims" is an exchange between Josephine Kane and counsel for Walter Snacki. Kane's husband, William, had applied to Kodak prior to the time Josephine approached Walter about arranging a job for William. Walter's counsel asked Josephine:

> [D]id he [Walter] ever say to you in connection with your husband's [prior] application at Eastman Kodak Company that if you didn't pay him the $500 that he was going to see someone at Kodak and be sure that * * * your husband's application would never be processed? Did he ever say that to you?
>
> A. No, he did not.

Trial trans. at 200. Similarly, Bernard Gauthier, another "victim" was asked: "Bob [Capo] never told you * * * that unless you paid this money for these jobs that any applications you had at Kodak would be destroyed, and you'd never get in? A. No." *Id.* at 331. Likewise, Joseph Scavo, who paid Ted to get jobs for Joe Pascente, Dawn Himmelsbach, and Michelle Sofia, testified:

> Q. You were not concerned, were you, if Mr. Snacki had to give you your money back that there would be any problem with Joe Pascente, Michelle [Sofia] or Dawn Himmelsbach applying through the routine channels at Eastman Kodak Company to obtain the job?

> A. Right.

*Id.* at 640. Carmella Angora, Annie La Delfa, and James Adams also stated that they felt no pressure to pay Walter Snacki. *See id.* at 209, 226, 428. These reactions are understandable given the absence of any evidence of detrimental action for nonpayment combined with the undisputed fact that the normal hiring channels remained open at Kodak at all relevant times.

Perhaps the best example of all, however, of the absence of any fear of economic loss on the part of these "victims" is the story of Brian Gauthier. After Bernard Gauthier, Brian's father, paid $800 to Bob Capo and was hired at Kodak, he approached Capo about a job for Brian. Bernard gave Capo another $800 along with Brian's completed application; however, shortly thereafter, Brian got an interview through an application he had earlier filed at Kodak on his own. Bernard then called Capo and told him not to put through Brian's paid-for application in order to give Brian an opportunity to be hired through the normal hiring process. Capo agreed and did not process that application until Brian learned that he had not been hired. Given the go-ahead, Capo then submitted Brian's application, which was soon granted. Certainly, if Capo were threatening to impair hiring prospects, or even implying that he would impair the prospects of applicants who did not pay, he would not have acted as he did. Conversely, if either of the Gauthiers in any way feared a reprisal by Capo they would not likely have felt comfortable asking him to hold Brian's application; indeed, most probably they would not even have told Capo about it.

The evidence relied upon most heavily by the panel majority was a statement that one witness, Paul Kelso, recounted had been made by Walter. Kelso confided in Walter that he and his wife, Marjorie Ann, were experiencing marital difficulties and told Walter that it would be easier for them to separate if Marjorie Ann could get a job. As noted earlier, Walter told Paul that he could get his wife a job at Kodak, but it would cost $500. Paul "questioned the fact of why would it have to cost something. He [Walter] says, '[Y]ou want her to get a job, don't you.'" Trial trans. at 79.

The panel majority read the latter statement as establishing fear of economic loss because it demonstrated that the "victims" paid because they thought that was their only chance of being hired at Kodak. *Capo,* 791 F.2d at 1064–65. While that assumption undoubtedly is true for Marjorie Ann Miller-Kelso and several others, it is not enough to establish extortion by wrongful use of fear of economic loss. Without evidence that the "victims" feared that defendants would impair their prospects of being hired, all the panel majority's observation shows is that they were unqualified, or were subjected to difficult economic circumstances, or for some other reason were unlikely to succeed through Kodak's normal hiring channels.

Walter's statement supports the conclusion that Paul Kelso paid $500 for his wife's job, not out of fear that Walter would otherwise impair her prospects for employment at Kodak, but, rather, to achieve a result she had been unable to attain on her own. In fact, Kelso later testified that "[b]efore all this came about I know my wife had put other applications into Kodak, and it was just a matter of waiting * * * for [Kodak] to call. So when this situation arose I figured it would just better our chances or better her chances to get a job." Trial trans. at 88. Walter's statement to Paul Kelso is devoid of any

suggestion of adverse action for nonpayment; fairly interpreted, all it connotes is that Walter would step in to help if, but only if, payment was made.

In short, what happened here is no more than what Judge Telesca expressly charged the jury did *not* constitute extortion; namely, "if you find that any defendant asked for the payment of money as a precondition to his using his influence with officials at Kodak to obtain a job for someone, that alone is not extortion."

*Capo*, 791 F.2d at 1072 (Pratt, J., dissenting in part) (emphasis in original).

II. *Extortion and commercial bribery.*

■ Although the Travel Act, 18 U.S.C. § 1952, may provide a federal jurisdictional base for prosecuting state-law bribery, commercial bribery is not within the reach of the Hobbs Act. Because these "victims" faced no increased risk if they did not pay, but, rather, stood only to improve their lots by paying defendants, this case is a classic example of bribery. While bribery and extortion are not neatly separable, *see United States v. Hathaway*, 534 F.2d 386, 395 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), they are distinct crimes. Both the payor and the recipient of a bribe are guilty of a crime, while under extortion statutes, only the extortionist has broken the law. *See* Ruff, *Federal Prosecution Of Local Corruption: A Case Study In The Making Of Law Enforcement Policy*, 65 Geo.L.J. 1171, 1190 (1977). Without evidence that the payor feared some negative intervention for nonpayment, the payment is solely intended to secure an otherwise unsecured result. That exemplifies bribery. In *Brecht*, we

recognize[d] that the line between "solicitation" of a commercial bribe and extortion of a payment is thin, as is the line between bribery and extortion. Yet if the defendant purports to have the power to hurt the victim in economic terms and fear is induced, the solicitation becomes an extortionate demand.

540 F.2d at 51 n. 11; *see also United States v. Hyde*, 448 F.2d 815, 833 (5th Cir.1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). We must recognize and respect that distinction if we are to avoid judicially subsuming state-law commercial bribery within the federal extortion statute.

This certainly is not the first time a defendant charged with violating the Hobbs Act has pleaded that his conduct constituted bribery and not extortion. *See, e.g., Brecht*, 540 F.2d at 51–52; *United States v. Gill*, 490 F.2d 233, 237 (7th Cir. 1973), *cert. denied*, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974); *United States v. DeMet*, 486 F.2d 816, 820 (7th Cir.1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). The arguments in those cases, however, were rejected because the victims there did in fact face a threat of suffering some economic disadvantage. For instance in *DeMet*, 486 F.2d at 819–20, the defendant, a Chicago police officer indicted for extortion of a bar owner by wrongful use of fear of economic loss, argued that he only received bribes and was not guilty of extortion. The court upheld the defendant's Hobbs Act conviction, finding sufficient evidence that the bar owner reasonably feared that defendant would exploit his position to harass and harm his business. "[T]he jury could reasonably infer from all the circumstances, including defendant's official position, that [the bar owner] was in fear of harm to his business, his fear was reasonable, and defendant exploited it to extort money and liquor." *Id.* at 820.

As we have noted, there is no evidence in the instant case that the "victims" were coerced or threatened by defendants, and all the evidence points to the conclusion that they paid voluntarily to improve their chances to get jobs they had not been able to obtain on their own. Therefore, defendants' conduct, while not constituting extortion by wrongful use of fear of economic loss, may well fall within the proscription of New York's commercial bribery statute, which provides:

An employee, agent or fiduciary is guilty of commercial bribe receiving in the second degree when, without the consent of

his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.

N.Y. Penal Law § 180.05 (McKinney Supp. 1986). As employees of Kodak, it appears that Baron and Ted might have been prosecuted directly under section 180.05, while Walter and Capo, non-Kodak employees, might have been reached as aiders and abettors. *See id.* § 20.00 (McKinney 1975). However, we cannot and need not resolve those questions here; it is sufficient for our purposes to conclude that, whatever state violations may have occurred, defendants' conduct did not constitute a violation of the Hobbs Act.

Presumably, a prosecutorial determination was made that the interstate-commerce federal jurisdictional base, *see* 18 U.S.C. § 1952(a), needed for a Travel Act bribery prosecution, *see id.* § 1952(b)(2), could not be proved here, and, therefore, that this situation could not be prosecuted federally unless it were made to fit under the Hobbs Act. Nevertheless, our extortion precedents do not stretch that far.

It is the sensitive duty of federal courts to review carefully the enforcement of our federal criminal statutes to prevent their injection into unintended areas of state governance. *See* Miner, *Federal Courts, Federal Crimes, and Federalism,* 10 Harv.J.L. & Pub. Pol'y 117, 128 (1987). Exercising that duty, we find it necessary to nullify this attempted application of the Hobbs Act to circumstances it was never meant to reach. Incremental extensions of federal criminal jurisdiction arguably present a more pernicious hazard for our federal system than would a bold accretion to the body of federal crimes. At a minimum, a clear extension of federal responsibility is likely to be sufficiently visible to provoke inquiries and debate about the propriety and desirability of changing the state-federal balance. Less abrupt, more subtle expansions, however, such as nearly occurred here, are less likely to trigger public debate and, yet, over time cumulatively may amount to substantial intrusions by federal officials into areas properly left to state enforcement. By holding that the Hobbs Act does not encompass state-law commercial bribery, we seek to demarcate a point beyond which congress intended federal prosecutors not to pass.

## CONCLUSION

Because defendants' activities were not properly reached under the Hobbs Act, that portion of the panel majority's decision addressing defendants' Hobbs Act convictions is vacated, the judgments of conviction under the Hobbs Act are reversed, and the Hobbs Act counts in the indictment are dismissed.

KEARSE, Circuit Judge, joined by TIMBERS, Circuit Judge, dissenting:

While I agree with much of the en banc majority's opinion as to the proper interpretation of the Hobbs Act, I dissent because the result it reaches depends on the majority's own interpretations of the evidence that are contrary to permissible inferences apparently drawn by the jury.

As the majority points out, we all agree that the instructions given to the jury were correct. The dividing point in this case is the proper factual inferences to be drawn from the evidence adduced at trial. Of that evidence, summarized in the panel majority opinion, *see* 791 F.2d at 1057–59, the most overt statement by a defendant that the jury could have interpreted as inducing fear on the part of the victims that they would be "denied any chance to obtain [Kodak employment] unless [they] paid," *United States v. Brecht,* 540 F.2d 45, 52 (2d Cir.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 578 (1977), was Walter Snacki's response to a question from Paul Kelso as to why Walter must be paid in order for Kelso's wife to get a job at Kodak. Walter asked, "You want her to get a job, don't you[?]" Further, though Walter may not have come right out and made the same statement to others, he nonetheless apparently managed to convey the impression that defendants had the power to withhold Kodak jobs unless the

demanded payments were made. Josephine Kane, who made or arranged payments for four people to get jobs, testified as follows:

"Q. [Cross-examination by Ted Snacki's lawyer] Now, it is true, Mrs. Kane, is it not, that on none of these four occasions did Walter Snacki tell you that if you didn't pay him the money none of those people would get employed—would ever get employed at Eastman Kodak Company, correct?

A. No. He did not come out and say that, no."

. . . .

"Q. [Redirect examination by the government] Mrs. Kane, Mr. Palmiere just asked you whether in your conversations with Mr. Snacki regarding these jobs he ever told you that these individuals wouldn't get a job if they didn't pay, and I believe your answer was he didn't come right out and say that.

Was there something that led you to believe that that might be the case?

A. Well, when he said that, you know, if he had the right amount of money he could get him the job. So I automatically figured they weren't going to get a job, you know, unless they got the money. But he didn't come out and say it.

The jury, properly instructed that it could not return a verdict of guilty on any Hobbs Act count unless it found that the victim reasonably feared that the defendant could and would impede his chances of getting a Kodak job, found the defendants guilty of most of the Hobbs Act charges against them. The en banc majority reaches the conclusion that the evidence was insufficient to support these verdicts by giving its *own* "fair[ ] interpret[ation]," *ante* at 954, to Walter's statement to Kelso, and by making its own finding that other evidence "supports the conclusion," *ante* at 953, that payments were made "voluntarily" and not out of any fear that defendants could or would impede the victims' being hired at Kodak. Were I the factfinder, I might agree. But because the factfinder was the jury and our province is

to review its findings by taking the evidence and drawing all inferences in the light most favorable to the government, I dissent.