In re AMERICAN HONDA MOTOR CO., INC. DEALERSHIPS RELATIONS LITIGATION.

FLYNN MOTORS, INC., et al.

v.

AMERICAN HONDA MOTOR CO., INC., et al.

METRO AUTO INC., et al.

v.

AMERICAN HONDA MOTOR CO., INC., et al.

MDL 95-1069.
Civ. Nos. JFM–95–2494, JFM–95–2493.

United States District Court,
D. Maryland.

May 19, 1997.

Richard B. McNamara, Wiggin & Nourie, Manchester, NH.

William A. Kershaw, Kronick, Moskovitz, Tiedemann & Gerard, Sacramento, CA.

Robert B. Green, Baltimore, MD.

James Ulwick, Kramon & Graham, Baltimore, MD.

## MEMORANDUM

MOTZ, Chief Judge.

This opinion pertains to two actions that have been transferred to the District of Maryland in this MDL proceeding but not included in the four representative complaints that have been filed after the transfer. The plaintiffs in Civil Action No.95–2493 are Metro Auto, Inc., a now defunct dealership, and Dominick and Shirley Rocco, who were the owners of Metro Auto. The plaintiffs in Civil No. 95–2494 are Flynn Motors, Inc., another defunct dealership, and John J. Flynn and the executrix of the estate of Robert Mendelsohn. Flynn and Mendelsohn were the owners of Flynn Motors. Raymond Hovsepian, one of the defendants named in both complaints, has filed motions to dismiss in each case. Commonwealth Insurance Company ("Commonwealth"), which is named as a defendant only in the Metro Auto action, also filed a motion to dismiss soon after the transfer of the action to Maryland. I deferred ruling upon that motion, ordering that limited discovery take place to flesh out plaintiffs' claims against Commonwealth. That discovery has now been completed, and Commonwealth has now filed a motion for summary judgment.

I will consider Hovsepian's motions only summarily. They were both denied in the Eastern District of Pennsylvania prior to the transfer of the *Metro Auto* and *Flynn* actions to Maryland, and in order to keep this litigation on track I have followed the practice of not revisiting matters ruled upon prior to transfer absent exceptional circumstances. Although Commonwealth's motion was also denied prior to transfer, the issues that it raises are sufficiently unique that reconsideration of this ruling is warranted, particularly

in light of the more complete record that now exists.

### I.

#### A.

In 1985 Dominick and Shirley Rocco inquired of American Honda about the possibility of obtaining the right to open a new Honda dealership in the Pennsylvania/New Jersey area.[1] They received a form letter in reply thanking them for their interest. In early 1986, plaintiffs repeated their desire to open a Honda dealership to their accountant, Irving Laserow. Several months later, Laserow introduced plaintiffs to Hovsepian, who subsequently informed plaintiffs that he would help them obtain a Honda franchise through his "California connections" at Honda.

At a meeting in Hovsepian's Philadelphia law office, Hovsepian told Dominick Rocco "that in order for Rocco to obtain the dealership, Hovsepian and the California partners would receive 50% of the profits of any Honda dealership that was opened." Hovsepian added that "this was the only way to get a Honda franchise." Rocco agreed, and Hovsepian agreed to handle all of the paperwork. In July 1986, Hovsepian informed plaintiffs that they had been awarded a dealership in Bloomsburg, Pennsylvania. On October 1, 1986, plaintiffs received a binding "Letter of Intent" (LOI) from Honda for the Bloomsburg location. The LOI was signed by Stanley Cardiges, an allegedly corrupt Honda executive. The Roccos had never filed an application to obtain the rights to the Bloomsburg point.

In January 1987, plaintiffs incorporated their dealership and issued 500 shares to themselves, 400 shares to Hovsepian, and 100 shares to Laserow. Hovsepian's 40% interest, some of which was allocated to Honda executives, remained secret. Plaintiffs' dealership agreement with Honda stated that Rocco owned 51% of Metro Honda and that Laserow owned 49%. Metro Honda opened for business in June 1987.

---

**1.** The following statement of facts is based upon the allegations made in the *Metro Auto* and *Flynn* complaints.

In the fall of 1988, Hovsepian demanded that the plaintiffs pay $500,000 to purchase his and Laserow's 50% interest in the dealership. He specifically told plaintiffs that he had the power to terminate their dealership rights and would do so if not paid. Although plaintiffs refused to sign a "purchase agreement," beginning in November 1988 they paid Hovsepian and Laserow monthly payments totaling $280,000 a over three-year period. These payments depleted plaintiffs' assets, causing them to default on commercial loans, preventing them from obtaining floor plan financing and eventually forcing them out of business.

### B.

John Flynn worked for many years as the Chief Financial Officer for one of several dealerships owned by Martin Lustgarten. Hovsepian was Lustgarten's long-time attorney, and Flynn knew that Hovsepian specialized in the field of automobile franchising. In 1991, Flynn and his partner Robert Mendelsohn (now deceased) contacted Hovsepian to represent them in their effort to acquire the right to open a Dodge dealership in southern New Jersey.

Shortly after being retained, Hovsepian urged plaintiffs to abandon their plan to obtain a Dodge dealership and instead to pursue an "open point" for a Honda dealership in Hammonton, New Jersey. In January 1992, plaintiffs met with Hovsepian and Roger Novelly (an allegedly corrupt Honda executive) at the Philadelphia Ritz–Carlton to discuss the Hammonton point. After discussing Flynn and Mendelsohn's extensive experience and financial backing, Novelly assured them that they would have no trouble obtaining the Hammonton point.

In March 1992, plaintiffs submitted a formal application package to Novelly. Plaintiffs also traveled to Hammonton to investigate locations for their dealership.

On April 9, 1992, Hovsepian forwarded a letter to plaintiffs demanding a professional fee of $250,000. Later that evening, at Hovsepian's home, Hovsepian explained that plaintiffs were required to pay that amount as a condition to obtaining an LOI for the Hammonton point. He further stated that the $250,000 would be divided equally among Novelly, Cardiges, two other Honda executives, and himself. Hovsepian explained that this kickback was required to obtain a dealership, but that it had to be channeled through him for distribution to the Honda executives.

Flynn and Mendelsohn refused to pay the kickback. Hovsepian informed them that they would not obtain the Hammonton dealership if they did not pay. Plaintiffs did not receive the Hammonton dealership.

### II.

Plaintiffs in the *Metro Auto* action assert claims against Hovsepian under 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d). Hovsepian has moved to dismiss all of these claims but he has not made any arguments as to the §§ 1962(b) and 1962(d) claims independent of those that he makes as to the § 1962© claim. Accordingly, I will only address the latter.[2]

### A.

#### (1)

Hovsepian first contends that plaintiffs' allegations concerning mail fraud, federal extortion and commercial bribery—the RICO predicate acts upon which they rely—are insufficient. Because it is clear that the Roccos knew that they were giving him a secret interest in the dealership, Hovsepian argues that no fraud occurred, at least vis-a-vis the Roccos and Metro Auto. That proposition may be assumed to be true. However, the complaint may be reasonably construed

---

**2.** Plaintiffs in both actions also assert several antitrust claims against Hovsepian and Commonwealth. The claims against Commonwealth are so lacking in substance that they do not merit discussion. I will not address in this opinion the antitrust claims asserted against Hovsepian and ask plaintiffs' counsel to advise me within fourteen days of the date of this opinion whether plaintiffs intend to pursue them at this time. I note that the plaintiffs in the representative complaints have dropped their Sherman Act claims and that I have held in ruling on the Robinson–Patman claims against Honda Motor and Lyon & Lyon that only parties to a sales transaction can be held liable under that statute.

as alleging that Hovsepian falsely held himself out as a knowledgeable specialist who could help navigate the Roccos through Honda's dealership allocation process when he in fact was only a front man for a fraudulent scheme to extract kickbacks from prospective Honda dealers. That would constitute fraud.

### (2)

Hovsepian next argues that plaintiffs have not made allegations which, if proved, would establish federal extortion. The Hobbs Act, 18 U.S.C. § 1951, defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." § 1951(b)(2). Plaintiffs have alleged that Hovsepian extorted a 50% interest in their business, as well as monthly payments over a three-year period totaling $280,000, by threatening to deny them the ability to operate Metro Honda. Hovsepian contends that "fear" as used in the Hobbs Act cannot encompass threats of an economic nature.

Hovsepian first relies on *Peterson v. Philadelphia Stock Exchange*, 717 F.Supp. 332 (E.D.Pa.1989). In *Peterson*, the plaintiff alleged that the exchange had attempted to force him to make certain payments on a preexisting debt by refusing him membership and by filing false arbitration claims; the court held that these allegations were insufficient under the Hobbs Act. *Id.* at 335–36. *Peterson* does not, however, announce a per se rule that extortion based on economic threats is not actionable under the Hobbs Act. Instead, *Peterson* held that the exchange's use of its otherwise valid membership and arbitration processes to apply pressure to plaintiff was not "wrongful" under § 1951(b). *Id.* at 336. In contrast, the *Metro Auto* plaintiffs allege that Hovsepian threatened to use his influence to interfere in their contractual right to operate Metro Honda, unquestionably a "wrongful" act.

The crux of Hovsepian's "economic fear" argument, however, is that plaintiffs cannot claim extortion when they in fact were merely paying bribes. Hovsepian cites a Second Circuit case, *United States v. Capo*, 817 F.2d 947 (2d Cir.1987), which reviewed a criminal

conviction under the Hobbs Act. In the criminal context, a crucial issue is whether a defendant's receipt of an illegal payment was based on extortion, which is a federal crime, or was a mere bribe, which is a state law offense. *Capo* explains that

> [C]ommercial bribery is not within the reach of the Hobbs Act. Because these 'victims' faced no increased risk if they did not pay, but, rather, stood only to improve their lots by paying defendants, this case is a classic example of bribery. While bribery and extortion are not neatly separable, ... they are distinct crimes.... Without evidence that the payor feared some negative intervention for nonpayment, the payment is solely intended to secure an otherwise unsecured result. 817 F.2d at 954 (citations omitted).

■ This reasoning seems sound. However, under the *Capo* analysis, plaintiffs have pled extortion based on their allegations that Hovsepian demanded monthly payments from 1988 to 1991. Although their initial agreement to cede a 50% stake in Metro Honda may not have constituted extortion because it was "solely intended to secure an otherwise unsecured result," plaintiffs clearly allege that the subsequent demands for payments were not part of the original bargain. Hovsepian's threats to take away plaintiffs' dealership therefore constitute threats of "negative intervention" that satisfy the requirements of the Hobbs Act.

### (3)

Hovsepian finally argues that plaintiffs' allegations of commercial bribery are insufficient. 18 U.S.C. § 1961(1) includes state law bribery within the definition of predicate acts; Pennsylvania's commercial bribery statute prohibits solicitation or acceptance of money or other consideration "without the consent of the employer or principal." 18 Pa. Cons. Stat. § 4108(a). Of course, Hovsepian did not accept the kickbacks that he solicited without his own consent. Further, he contends that to the extent that Honda can be deemed to be his principal, plaintiffs themselves allege that high-ranking Honda officials knew of his activities and indeed participated in them. This contention may

have merit. However, I need not decide the issue now in light of my ruling that plaintiffs have stated other cognizable predicate acts.

## B.

■ Hovsepian also argues that plaintiffs have failed to allege a "pattern" of racketeering activity. This argument is wholly without merit. At the least plaintiffs have alleged a pattern of extortion in the form of monthly demands for payments that lasted from 1988 to 1991. More broadly, when viewed together with the allegations in the *Flynn* complaint, there are more than sufficient allegations that Hovsepian, in concert with Stanley Cardiges and other Honda executives, engaged in a long-running and widespread scheme to extract kickbacks from Honda dealers and prospective Honda dealers.

## III.

The claims in the *Flynn* case are more problematical. This may seem ironic since in *Flynn* plaintiffs were more virtuous than were the plaintiffs in *Metro Auto*, having refused to accede to Hovsepian's demands. The *Flynn* plaintiffs may, however, be asking too great a reward for their virtue. They assert extortion as the only predicate act and they are seeking as damages not the losses they suffered in attempting to obtain a Honda dealership but the profits they would have earned if the dealership had been awarded.

This request for relief presents two legal difficulties. First, it is questionable whether plaintiffs can prove injury sufficiently concrete to be cognizable under RICO. Second, if the *Capo* case was correctly decided and applies in the civil context, any payment that plaintiffs would have made to obtain the dealership would have constituted bribery and not extortion.

Despite these difficulties I will permit discovery to proceed. Plaintiffs take the position that it was a virtual certainty that they would ultimately be awarded the dealership. If that is true, by depriving plaintiffs of their dealership because they would not pay the

kickback, defendants arguably committed an act of "negative intervention" within the meaning of *Capo*. Likewise, if the award of the dealership was assured, plaintiffs may be able to establish concrete loss. Plaintiffs might be well advised, however, to amend their complaint to make allegations of fraud as well as extortion, seeking as damages in regard to those allegations the costs they incurred in attempting to obtain the Honda dealership.

## IV.

As stated above, claims are asserted against Commonwealth only in the *Metro Auto* complaint. Plaintiffs make the following factual allegations in regard to those claims.[3]

On October 1, 1987, approximately nine months after the Roccos had given Hovsepian, Laserow and Honda executives a 50% interest in Metro Auto and approximately three months after Metro Auto had opened for business, plaintiffs purchased 50,000 shares of stock of Pennsylvania Group, Ltd. Pennsylvania Group had been formed for the sole purpose of becoming a holding company for an insurance subsidiary. This subsidiary turned out to be Commonwealth, which was not incorporated until February, 1989. Hovsepian was the president of Pennsylvania Group and the secretary-treasurer of Commonwealth.

The Roccos claim that they were coerced into purchasing the Pennsylvania Group stock. They allege that they did not want to purchase the shares but did so because they feared that Hovsepian would take away their right to operate Metro Auto. As stated by Mr. Rocco on deposition, he bought the stock because he felt a "certain obligation" to Hovsepian for having obtained the Honda dealership for him and he "didn't want to upset Hovsepian by not buying it."

During a meeting held in July, 1989, all Pennsylvania Group shareholders, including the Roccos, were given an opportunity to rescind their stock purchase. The Roccos did not do so. On deposition Mr. Rocco

---

**3.** Some of these allegations are not asserted in the complaint itself but in plaintiffs' memorandum opposing Commonwealth's summary judgment motion.

explained his reasons, stating that he was reluctant to rescind "because of ramifications . . . with the Honda franchise" and because "Hovsepian pled with me not to." Rocco does not assert that Hovsepian made any direct threat that he would take away the franchise either if the Roccos did not purchase the Pennsylvania Group stock originally or if they accepted the rescission offer.

Over a three-year period, beginning in November, 1988, plaintiffs paid Hovsepian over $280,000. They allege that these payments depleted their resources and required the Roccos to borrow $70,000 from a company known as Wyncote Financial. Because of the Roccos' financial problems, Wyncote demanded security for the loan and determined that the Roccos' assets already had too many outstanding liens to serve as adequate collateral. The Roccos then went to Hovsepian, who arranged for Commonwealth to issue a surety bond to Wyncote. The Roccos used an already heavily mortgaged shore property they owned in Stone Harbor, New Jersey, as security.

Plaintiffs did not repay the Wyncote loan, and Commonwealth was required to pay out under its bond to Wyncote. Thereafter, Commonwealth obtained a judgment against the Roccos for the amount that it paid, plus interest, fees and costs. When this judgment was not paid, Commonwealth recorded it among the land records in jurisdictions in which the Roccos owned property. In January, 1992, the Roccos attempted to sell a property that Mrs. Rocco owned in Feasterville, Pennsylvania, but could not do so because of the outstanding lien. The Roccos went to Hovsepian and requested that the lien be released. Hovsepian refused to do so unless plaintiffs signed a backdated "purchase" agreement, referred to by the parties as the "As of November 3, 1988 agreement," reflecting the Rocco's purchase of Hovsepian's and Laserow's 50% interest in Metro Auto. Plaintiffs signed the agreement but they never made any payments under it.

## V.

Plaintiffs assert claims against Commonwealth under §§ 1962(b), 1962(c), and 1962(d). The parties have extensively briefed such questions as (1) whether Hovsepian's act of allegedly coercing the Roccos to purchase Pennsylvania Group stock prior to Commonwealth's incorporation can be properly attributed to Commonwealth, (2) whether in the absence of any statement by Hovsepian linking the purchase of the stock with the award of the dealership (and later not connecting Pennsylvania Group's rescission offer with keeping the dealership), Hovsepian committed any unlawful act of coercion, (3) whether Commonwealth's bonding of the Wyncote loan, subsequent payment on its bond, and obtaining a judgment against the Roccos constituted predicate acts under RICO, (4) whether the several predicate acts alleged against Commonwealth meet the "continuity and relationship" tests of RICO's "pattern" requirement, and (5) whether any of the alleged predicate acts caused any damage to the Roccos. Plaintiffs' arguments on most of these issues (with the possible exception of the fourth) are quite weak. However, plaintiffs' claims fail on broader grounds which can be simply addressed.

### (1)

As courts have interpreted § 1962(b), the type of control required is that which would give the racketeering enterprise the power to affect the composition of the board of directors of the affected business, *Moffatt Enterprises, Inc. v. Borden, Inc.*, 763 F.Supp. 143, 147 (W.D.Pa.1990), or the day-to-day operation of the business. *Teague v. Bakker*, 35 F.3d 978, 995 (4th Cir.1994), *cert. denied*, 513 U.S. 1153, 115 S.Ct. 1107, 130 L.Ed.2d 1073 (1995). In addition, it must be shown that the racketeering enterprise obtained its interest via the racketeering activity itself or the funds thereby generated. *South Carolina Elec. & Gas v. Westinghouse Elec. Co.*, 826 F.Supp. 1549, 1561 (D.S.C. 1993). As plaintiffs state, this standard can also be described as requiring a "nexus between the control of the enterprise and [the] racketeering activity." Pl. Amended Resp. at 27 (citing *Davis v. Hudgins*, 896 F.Supp. 561, 566 (E.D.Va.1995), *aff'd*, 87 F.3d 1308 (4th Cir.1996)).

In the instant case the alleged racketeering enterprise was Commonwealth and

the alleged victim was Metro. Metro has provided insufficient evidence from which it could be reasonably inferred that Commonwealth gained enough power to affect the composition of Metro's board of directors or to engage in the day-to-day operations of Metro. At most, Commonwealth coerced the Roccos into purchasing and holding on to Pennsylvania Group stock, provided security for a loan, and forced the Rocco's to agree to buy out Hovsepian's and Laserow's pre-existing interest in Metro. These acts simply do not exhibit any sort of control commensurate with the examples given in *Moffatt* or *Teague*. Although Hovsepian and Laserow may have obtained control over Metro by acquiring an interest in it, Commonwealth was not involved in that acquisition. Thus, the § 1962(b) claim against Commonwealth fails.

### (2)

■ In *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993), the Supreme Court held that in order for a defendant "to conduct or participate ... in the conduct of [an] enterprise's affairs" within the meaning of § 1962(c), she must have "participate[d] in the operation or management of the enterprise itself." The "enterprise" alleged here by plaintiffs was an "enterprise-in-fact" consisting of Hovsepian, Laserow, American Honda, Honda Motor, and Honda executives. Any allegations that Commonwealth "participate[d] in the operation or management of" this alleged enterprise are entirely without substance. At the most, plaintiffs have alleged that Commonwealth aided and abetted the conduct of the enterprise. The sufficiency of this allegation does not survive *Reves* and *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). *See In re American Honda Motor Co., Inc. Dealerships Relations Litigation,* 941 F.Supp. 528, 544–45 (D.Md. 1997).

### (3)

■ Plaintiffs' claim under § 1962(d) provides a somewhat closer question. It is well established that "RICO conspiracy does not require that each coconspirator personally agree to commit two or more acts of racketeering...." *United States v. Pryba,* 900 F.2d 748, 760 (4th Cir.1990). Similarly, a "defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those acts." *United States v. Adams,* 759 F.2d 1099, 1116 (3d Cir.1985). Thus, the mere fact that Commonwealth did not itself commit two or more predicate acts does not constitute a defense to the § 1962(d) claim.

■ On the other hand, simply assisting in the effectuation of the RICO scheme is not alone sufficient to bring a defendant within the ambit of § 1962(d). If the defendant has not himself committed (or directed the commission of) the necessary predicate acts, he must at least have agreed (expressly or impliedly) that someone else do so. *See Pryba,* 900 F.2d at 760; *Adams,* 759 F.2d at 1116; *United States v. Joseph,* 781 F.2d 549, 554 (6th Cir.1986). The Third Circuit has further articulated this distinction as follows:

> [W]e believe that a distinction can be drawn between, on the one hand, conspiring *to* operate or manage an enterprise, and on the other, conspiring *with* someone who is operating or managing the enterprise. Liability under section 1962(d) would be permissible under the first scenario, but, without more, not under the second.

*United States v. Antar,* 53 F.3d 568, 581 (3d Cir.1995) (emphasis in original).[4]

■ Here, plaintiffs have made no allegations from which it can reasonably be inferred (and the discovery which has been conducted has established no such facts) that Commonwealth agreed that the other defendants would engage in RICO violations. Commonwealth's acts of providing a bond for

---

4. In *In Re American Honda Motor Co., Inc. Dealerships Relations Litigation,* 941 F.Supp. 528, 560 n. 40 (D.Md.1996), I stated that the distinction drawn by the Third Circuit in *Antar* "while appealing on its face and sensible in the context of the facts which the court was addressing, may prove difficult to apply in practice." Assuming that this observation has any generic merit, the present case is another instance in which the distinction is "sensible in the context of the facts" presented.

the Wyncote loan and eventually obtaining a judgment against the Roccos after having paid off on the bond were not themselves wrongful and imply no wrongful knowledge or agreement. The only act alleged against Commonwealth which was wrongful and gives rise to an inference of agreement was the coercive act of making the Roccos sign the "As of November 3, 1988" agreement, backdating their "purchase" of Hovsepian's and Laserow's 50% interest in Metro Auto, in return for releasing Commonwealth's lien on Mrs. Rocco's Feasterville property. However wrongful this act may have been, it caused the Roccos no damage since they never thereafter made any payment to Hovsepian under the agreement.

More to the point, no inference that Commonwealth agreed that others would commit a RICO predicate act can be inferred from this alleged act of coercion since all of the predicate acts had been completed before the "As of November 3, 1988" agreement was signed. It may be that Commonwealth was saved from joining the RICO conspiracy by the coincidence of time. However, if § 1962(d) is construed so expansively as to bring within the reach of RICO every person who has committed any act related to the underlying wrongful conduct prohibited by RICO, however tangential and inconsequential, the technical restrictions placed by Congress and the courts upon claims arising (and prosecutions brought) under RICO's substantive provisions would become meaningless. Here, although Commonwealth's alleged act of coercing the Roccos may not have been tangential, it was entirely without consequence. At the most Commonwealth became an "accessory after the fact" to the RICO enterprise, a role which is not within the ambit of RICO.

A separate order effecting the rulings made in this opinion is being entered herewith.

### ORDER

For the reasons stated in the memorandum entered herewith, it is, this 19th day of May 1997

ORDERED

1. The motion to dismiss filed by Raymond Hovsepian in *Flynn Motors, Inc. v. American Honda Motor Co.*, Civil No. JFM–95–2494 and *Metro Honda, Inc. v. American Honda Motor Co.*, Civil No. JFM–95–2493 as to plaintiffs' RICO claims is denied;

2. Plaintiffs in both actions are to advise the court within fourteen days of the date of this order as to whether they are pursuing antitrust claims against Hovsepian; and

3. The motion for summary judgment filed by Commonwealth Insurance Company in *Metro Honda, Inc. v. American Honda Motor Co.*, Civil No. JFM–95–2493 is granted.