906 F.2d 814
 30 Fed. R. Evid. Serv. 528
 UNITED STATES of America, Appellee,
v.
Moe TILLEM, et al., Defendants.
Appeal of Thomas OVERTON, Desmond Larrier, Astley Campbell,
Elissa Cohen-Deutsch, a/k/a "Lisa", Bernard
Taynor, Albert Simms, Harvey Cohen, Carl
Bower, Defendants-Appellants.
UNITED STATES of America, Appellee-Cross-Appellant, (Re: 89-1225)
v.
Moe TILLEM, et al., Defendants.
Appeal of Elissa COHEN-DEUTSCH, Defendant-Appellant
Cross-Appellee. (Re: 89-1225).
 Nos. 658, 675-677, 679, 680, 682, Dockets 89-1139, 89-1146,
89-1181, 89-1224, 89-1225, 89-1297, 89-1376.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 8, 1990.
Decided June 19, 1990.
 
 Daniel H. Murphy, II, New York City, for defendant-appellant Albert Simms.
 James C. Sherwood, New York City (Kathyrn Keneally, Kostelanetz Ritholz Tigue & Fink, New York City, of counsel), for defendant-appellant Carl Bower.
 Lloyd Epstein, New York City (Epstein, Hus & Weil, New York City, of counsel), for defendant-appellant Desmond Larrier.
 Barry Gene Rhodes, Brooklyn, N.Y., for defendant-appellant Thomas Overton.
 Brian Barrett, New York City (Howard W. Goldstein, Mudge Rose Guthrie Alexander & Ferdon, New York City, of counsel), for defendant-appellant Astley Campbell.
 Michael Shapiro, New York City (Barry I. Slotnick, Mark M. Baker, Slotnick & Baker, and Lori E. Mann, Law Graduate, on the brief, New York City, of counsel), for defendant-appellant Bernard Taynor.
 Sean F. O'Shea, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., David C. James, Emily Berger, and Eric Friedberg, Asst. U.S. Attys., of counsel), for appellee the U.S.
 Before VAN GRAAFEILAND, CARDAMONE and ALTIMARI, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal focuses on employees of the New York City Department of Health who inspect Manhattan restaurants to determine whether they comply with the City Health Code. Before us are six defendants all of whom, except for one, were employees of the Department of Health, and all of whom were convicted of extorting restaurant owners to pay them money or give them free meals in order to pass inspection. What is revealed in the record is not an indictment of City restaurants, but rather the corrupt action of a group of City inspectors who, for example, would order an eight course meal in an expensive restaurant and then leave without paying. Honesty was not their daily fare.
 
 
 2
 Appellants, Carl Bower, Albert Simms, Thomas Overton, Desmond Larrier and Astley Campbell appeal judgments entered in the United States District Court for the Eastern District of New York (Bartels, J.), on January 18, 1989, following jury verdicts convicting them for extortionate activity violative of the Hobbs Act, 18 U.S.C. Sec. 1951 (1988), and engagement in a racketeering enterprise violative of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1962(c) & (d) (1988). Appellant Overton also appeals his sentence and appellant Bernard Taynor appeals his sentence, imposed following his guilty plea to a violation of the Hobbs Act. With the exception of the one non-employee of the Department, all the convictions are affirmed.
 
 FACTS
 
 3
 The appellants are among 46 individuals arrested after a lengthy investigation into a scheme of corruption that took place in the New York City Department of Health (City Health Department or Department). Twenty-eight individuals were charged with extortionate conduct in the original indictment, of whom 26 pled guilty, including appellant Taynor, pursuant to plea agreements with the government. Nine defendants--five of whom together with Taynor constitute the present six appellants--were charged in a superseding indictment, Cr. No. 88 Cr 219(S-2), with inter alia engaging in a pattern of racketeering involving extortionate activity violative of the Hobbs Act. The defendants fell into two categories: those who worked for the City Health Department and those who were restaurant "consultants" that assisted restauranteurs in passing the Department's inspections. All of the present appellants, except Campbell, were employed by the City Health Department.
 
 A. City Health Department Appellants
 
 4
 The City Health Department is the municipal agency charged with enforcing the New York City Health Code in City restaurants. The present conspiracy involved all aspects of the Department's operation, which is separated into divisions that oversee various aspects of a restaurant's operation. The superseding indictment alleged that the Bureau of Field Services, the Borough Inspection Unit, the Plans and Equipment Unit of the Bureau of Technical Services, the Administrative Tribunal, the Food Sampling Unit and the Code Enforcement Unit, constituted "enterprises", all of which engaged in a pattern of racketeering activity within the meaning of RICO.
 
 
 5
 Each of these divisions performs a different function in the Department's operations. The Plans and Equipment Unit, where appellant Larrier was employed, initially reviews the plans for restauranteurs seeking to open a new facility. Once a restauranteur receives approval from this Unit, the Department sends a representative of the Bureau of Field Services to conduct an on-site "pre-operational" or "pre-permit" inspection. After a restaurant receives an operating permit and is open to the public, the Bureau of Field Services performs periodic inspections, and the Borough Inspection Unit makes inspections following consumer complaints. If a restaurant fails two inspections conducted by either the Bureau of Field Services or the Borough Inspection Unit, a member of the Code Enforcement Unit conducts a final inspection. Members of the Code Enforcement Unit conduct final inspections of restaurants in pairs and have the power to close a facility for failure to pass final inspection. The City Health Department also conducts inspections through the Food Sampling Unit in the Bureau of Technical Services, which takes food samples from restaurants and brings them to a laboratory to test for bacterial contamination. After two unsatisfactory food sampling tests, the Food Sampling Unit may require that a restaurant remove a food item from its menu.
 
 
 6
 The evidence at trial established that inspectors used a variety of methods to induce restauranteurs to pay them money, give them free meals or provide them with other services in exchange for passing the restaurant during inspections. The inspectors--and the supervisors with whom they shared the extorted monies--developed their own parlance for these activities. Thus, for instance, the phrase "bite the bullet" meant that the inspector should not take any money from a restaurant because funds had already been paid over; "cup of coffee" or "he will buy you a cup of coffee" signified that the restauranteur would pay more than the going rate; "good stop" indicated that the restaurant would pay a considerable sum for inspection approval; the "open draw[er] policy" reflected the practice of inspectors placing a share of their ill-gotten gains into the desk drawers of their supervisors; and "friends" referred to persons from whom an inspector had previously received a payoff of money, meals or services.
 
 
 7
 At trial the government presented extensive evidence on the extortionate activities of the appellants Bower, Simms, Overton and Larrier. Robert Levine, a former inspector on Staten Island, testified that he accompanied Bower on inspections, reinspections, and final inspections of at least 11 restaurants from 1986 to 1988, during which they received money and meals from restauranteurs in exchange for their passing the restaurant after inspection. He testified that Bower negotiated for receipt of specific sums of money in exchange for giving a restaurant favorable inspection regardless of whether it failed to meet Code requirements. Dean Nanjad, another former inspector, testified that during the four weeks in 1987 that he worked with appellant Simms in the Code Enforcement Unit they received money from at least eight restaurants that they passed after inspection, many of which had conditions that violated the Code. Simms, he testified, would negotiate for payment from the owner while he conducted an inspection of the premises. On at least two occasions, Nanjad testified, Simms solicited payment from restauranteurs notwithstanding that Nanjad's inspection revealed them to be free of Code violations. Another inspector, Harvey Dlugatch, indicated that he accompanied appellant Overton, a member of the Food Sampling Unit, to at least nine restaurants where they received money in exchange for their acceptance of "compromised" samples--food samples prepared separate from the remainder of the restaurant fare--which they brought to the laboratory for testing. Dlugatch indicated that they received the money primarily from restauranteurs with whom they had dealt before and who were aware that payment was essential for the acceptance of compromised samples. When they spoke to an "innocent" manager, they "hinted" that payment was necessary for them "to try to do the best [they could] for [the restaurant.]"
 
 
 8
 The government also produced evidence corroborating the extortionate activities of Larrier, a member of the Plans and Equipment Unit. Sam Witlow, an investor in a group of delicatessens, testified that Larrier indicated that he would take care of the paperwork for two new delis if Witlow paid him $200 each. Larrier had indicated this arrangement by rubbing his thumb and forefinger together. A short time after this transaction, Larrier approved the initial permits for six or seven delis that were operating without proper permits in exchange for Witlow's payment of $200 per restaurant. Witlow advised two other restauranteurs of Larrier's arrangement, and Larrier demanded $300 for each restaurant for his approval of their plans. In addition, Steve Vassilakos, a restaurant consultant, testified that Larrier asked him for "loans" of money in exchange for his approval of the plans of Vassilakos' client restaurants. Vassilakos paid $20 to $50 to Witlow on several occasions, but was never repaid.
 
 B. Campbell
 
 9
 Campbell, like the other restaurant consultants charged in the indictment, was not employed by the City Health Department. He was retained by various restauranteurs to assist them in passing inspections. Prior to 1987 he had been employed by the Riese Organization--a corporation owning numerous restaurants and real estate properties--to assist in their dealings with the Department. At the end of 1986 Campbell established an independent consulting business providing the same services as he had provided while an employee of the Riese Organization, which then became his primary client. Campbell was motivated to enter his own business by the poor management salaries offered by Riese and the greater benefits available through operating his own company. He never expressed an intention to use his contacts at the Department of Health to aid his consulting business. During the 20-month period from January 1987 through September 1988, Riese paid Campbell's consulting firm, Astley Campbell and Associates, a retainer of more than $12,000 a month or a total of $250,840.
 
 
 10
 Testimony established that Campbell assisted the Riese restaurants in passing inspection. He insured that self-inspections were conducted regularly, that the restaurants were cleaned after failing inspection, and he would accompany the inspectors and take notes on their findings. Wayne Gibson, a former inspector, testified that "Campbell always ... saw to it that these places were clean. It wasn't like the other ones that we went to. He did a good job." Notwithstanding that his restaurants were ordinarily "clean," Campbell made payments regularly to guarantee that his client's restaurants would pass inspection. The testimony focused on incidents involving three Riese Organization restaurants, Track 15 Snack Bar, Leo Lindy's and Charley O's, all of which were victims of Campbell's alleged extortionate conduct charged in the superseding indictment.
 
 
 11
 Track 15 was closed after failing to pass a final inspection on December 7, 1987. The next day Campbell called Moe Tillem, the Department's Chief of Code Enforcement, to inform him that the Department had closed one of his client's restaurants. Tillem responded "oh my God, I didn't know that was yours" and told Campbell to "come on down, and give me [Tillem] the necessary papers [and] we'll do the reopening." Thirty minutes later Campbell went to Tillem's office to arrange the reopening. While there, appellant Simms called and Tillem put Campbell on the telephone. Campbell told Simms to meet him the next morning at a coffee shop near Track 15 so that Simms could reinspect and reopen the Track 15 restaurant. Tillem picked up the telephone after Campbell got off and told Simms that "Astley [Campbell] said he'll buy you coffee tomorrow." The next morning Simms and another inspector Rachel Carter went to the coffee shop where they had agreed to meet Campbell. Campbell did not appear, but the two inspectors met an unidentified man, never inspected the Track 15 restaurant, but nonetheless reopened it with a test score of 100 percent.
 
 
 12
 The other two incidents involving Leo Lindy's and Charley O's occurred earlier, on July 23, 1986, while Campbell was still an employee of the Riese Organization. Inspector Gibson testified that on July 23 he was called to Leo Lindy's on a citizen complaint of flies in the basement. Upon arrival he noticed additional violations. When Campbell appeared he discussed some of the violations with Gibson, ordered several employees to correct some of the violations, and paid Gibson $50 in exchange for his overlooking the presence of flies. Campbell and Gibson walked over to Charley O's, another Riese restaurant, where the Department had received a citizen complaint of mice. Campbell and Gibson had breakfast after this inspection and Campbell handed Gibson $50 for his ignoring the mouse droppings.
 
 
 13
 Based upon this testimony the government charged Campbell with extortion and aiding and abetting the Department's inspectors' extortionate conduct in violation of the Hobbs Act and RICO.
 
 C. Post-Trial Proceedings
 
 14
 On January 5, 1989 the jury found Bower, Simms, Overton, Larrier and Campbell guilty of the two RICO counts and at least two counts of Hobbs Act violations. Appellant Taynor pled guilty to one count of violating the Hobbs Act. At sentencing the district court sentenced appellants to the following terms of incarceration: Bower--18 months, Simms--30 months, Overton--32 months, Larrier--30 months, Campbell--24 months, and Taynor--24 months.
 
 
 15
 The trial court granted only Campbell's bail motion pending appeal. In granting the motion under 18 U.S.C. Sec. 3143(b) (1988) and under the standards we articulated in United States v. Randell, 761 F.2d 122, 125 (2d Cir.), cert. denied, 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985), the district court noted that
 
 
 16
 the real issue to be raised on appeal is whether this defendant, who is a restaurant consultant, was simply a briber or was an aider and abettor of an extortionist and this is not a frivolous question.
 
 
 17
 The Court notes also that this defendant is different from all of the other defendants. His circumstances are unique. He was not an employee of the Department of Health, he was a restaurant consultant. He was an independent consultant, and then acted as a consultant to the Riese organization. The evidence against this defendant showed that he "paid off" restaurant inspectors with money he took from his pocket. In finding that this defendant extorted this money from the restaurants or the Riese organization the jury had to rely on circumstantial evidence to make the necessary inferences.
 
 
 18
 United States v. Campbell, No. 88 CR 219 (S-2), slip op. at 3-4 (E.D.N.Y. Apr. 14, 1989) CA at v-vi.
 
 DISCUSSION
 
 19
 A number of issues are raised by the various appellants. For organizational purposes they are divided into three categories. In the first category are contentions of prosecutorial misconduct or insufficiencies, including the sufficiency of the evidence and an asserted Brady violation. The second category is composed of errors the trial judge is alleged to have made, including: the jury instructions regarding RICO, a failure to sever one of the defendants, limitation on cross-examination and a refusal to charge the jury regarding the defense's theory of the case. The third category includes supposed errors in the application of the sentencing guidelines.I. PROSECUTORIAL FAILURES
 
 A. Sufficiency of the Evidence
 1. With Respect to Department Appellants
 
 20
 Appellants Bower, Simms, Overton, and Larrier argue that the jury verdict was based upon insufficient evidence. Those challenging the sufficiency of the evidence rarely carry the day, United States v. Ferguson, 758 F.2d 843, 855 (2d Cir.), cert. denied, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985), because a conviction will be upheld when there is substantial evidence "viewed in the light most favorable to the government" to support it. Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). Under this standard, the challenged verdicts must stand.
 
 
 21
 The Department appellants have been convicted of violating the Hobbs Act through their receipt of money, meals and services from restauranteurs "under color of official right." The Act provides in pertinent part:
 
 
 22
 (a) Whoever in any way or degree obstructs, delays, or affects commerce ... by ... extortion or attempts or conspires so to do ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 
 
 23
 (b) As used in this section--
 
 
 24
 . . . . .
 
 
 25
 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
 
 
 26
 Appellants contend the government failed to present sufficient evidence that they induced restauranteurs to give them this property.
 
 
 27
 Extortion under color of official right occurs when an official uses the authority of his office to obtain unearned money. Unlike other forms of extortion, "[t]he public officer's misuse of his office supplies the necessary element of coercion, and the wrongful use of official power need not be accompanied by actual or threatened force, violence, or fear." United States v. Margiotta, 688 F.2d 108, 130-31 (2d Cir.1982), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).
 
 
 28
 Appellants argue that reversal is mandated by our holding in United States v. O'Grady, 742 F.2d 682 (2d Cir.1984) (en banc ). In O'Grady the convictions were reversed because the jury instructions indicated that the government need only show that public officials accepted benefits when "the official knew that his office was the motivation behind the giving of the benefits." Id. at 687. We stated that "[w]hile the government is not required to prove that the public official demanded or directly solicited the benefits received, or that he offered a specific quid pro quo in exchange for the benefits, the government must show that the power of public office was misused in such a way as to induce the giving of benefits." Id. at 688-89. We acknowledged that this inducement could take many forms including subtle requests, demands, or solicitations that may be established through circumstantial evidence. Id. at 691-92.
 
 
 29
 Here the government amply established that appellants Bower, Simms, Overton and Larrier used the authority of their positions to induce restauranteurs to provide property in exchange for favorable inspections. The evidence established that there was a pervasive atmosphere of fear in the restaurant industry. Restauranteurs were aware that payment was a prerequisite to passing inspection and Department inspectors made it a practice to revisit restaurants that were receptive to making payments. Appellants utilized code words and hand signals to communicate to restauranteurs that in order to pass an inspection they had to pay. Testimony established that all four of these appellants extracted money with subtle signals--such as rubbing the thumb and forefingers together--and not-so-subtle verbal demands.
 
 
 30
 Appellants extracted payments from restauranteurs and consultants regardless of whether the restaurant evidenced Code violations. The government established that the Department inspectors required payment for passing restaurants even when they were "clean." Hence, the guilty verdicts against these four appellants are amply supported by the evidence.
 
 
 31
 Appellant Bower also challenges whether the evidence sufficiently established a nexus between the RICO enterprise and the Hobbs Act violations he committed, as required by 18 U.S.C. Sec. 1962(c) (1988). A relationship is established when "(1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise ..., or (2) the predicate offenses are related to the activities of that enterprise." United States v. Scotto, 641 F.2d 47, 54 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). Again viewing the proof in the light most favorable to the government, it shows that Bower was enabled to commit extortion by reason of his position as an inspector and supervisor at the City Health Department. Thus, Bower's RICO conviction finds sufficient support in the record.
 
 2. Sufficiency Regarding Campbell
 
 32
 The government charged and convicted Campbell of extortion or aiding or abetting the Department's officials in their extortionate conspiracy. See 18 U.S.C. Sec. 2(a) (1982) ("[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").
 
 
 33
 Campbell's Hobbs Act conviction cannot stand. He was not an official in the City Department of Health; thus, he cannot be convicted of extortion under color of official right. Nor may his conviction rest on a theory of threatened force or fear. In United States v. Capo, 817 F.2d 947 (2d Cir.1987) (en banc ), we reversed the Hobbs Act convictions of employees of Eastman Kodak who "sold" certain job positions to applicants where the evidence failed to establish an essential element of extortion, that is, that the victims were induced to pay money by fear of economic loss. We concluded that:
 
 
 34
 [b]ecause these 'victims' [the job applicants] faced no increased risk if they did not pay, but, rather, stood only to improve their lots by paying defendants, this case is a classic example of bribery. While bribery and extortion are not neatly separable, they are distinct crimes. Both the payor and the recipient of a bribe are guilty of a crime, while under extortion statutes, only the extortionist has broken the law. Without evidence that the payor feared some negative intervention for nonpayment, the payment is solely intended to secure an otherwise unsecured result. That exemplifies bribery.
 
 
 35
 Id. at 954. Here the evidence fails to establish that Campbell's clients paid him fearing a negative intervention for nonpayment. Thus, under Capo he may at most be found guilty of bribery.
 
 
 36
 With respect to his culpability as an aider or abettor, the parties disagree on the conclusions to be drawn from the trial evidence of his activities regarding Track 15, Leo Lindy's, and Charley O's. The government contends that Campbell aided or abetted the Department inspectors by facilitating their receipt of property extorted under the color of their office. It argues that he--originally a victim--became an aider or abettor by seeking out corrupt government officials and paying them money to insure that Riese restaurants would pass inspection. It claims that Campbell lost his status as a victim of the Department officials' extortionate demands by going beyond mere acquiescence and becoming instead an active assistant in their conspiracy. Campbell responds that there was no evidence that he made any payment to reopen Track 15 or that the money paid to "assist" the inspections of Leo Lindy's and Charley O's came out of the Riese Organization rather than from his own pocket.
 
 
 37
 Finding culpability when a "victim" goes beyond passive compliance and becomes an active participant in a conspiracy has been a principle of our common law from the turn-of-the-century. See, e.g., United States v. Holte, 236 U.S. 140, 145, 35 S.Ct. 271, 272, 59 L.Ed. 504 (1915) (female "victim" guilty as a co-conspirator when she willingly participated in her illegal transportation across state lines); United States v. Beech-nut Nutrition Corp., 871 F.2d 1181, 1192-93 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989) (apple juice manufacturer, originally a victim, became co-conspirator with supplier by willingly cooperating with supplier who provided adulterated concentrate).
 
 
 38
 When we view the evidence in the light most favorable to the government, as we must, we conclude there is a basis upon which a reasonable jury could find that Campbell paid money to reopen Track 15. Concededly, the surveillance agents did not observe any payoff at the coffee shop, and Campbell was not even present. Yet, taking all inferences in favor of the government a reasonable trier of fact could conclude that Tillem's statement to Simms that "Astley [Campbell] said he'll buy you coffee tomorrow" established that a payoff was made at the coffee shop. In addition, a reasonable trier of fact could easily find that the $100 paid by Campbell to Gibson came indirectly from the Riese Organization.
 
 
 39
 Nonetheless, such a finding merely establishes that Campbell operated as a conduit through which the Department defendants extorted money from restauranteurs or the Riese Organization. It does not prove that Campbell was an aider or abettor of the extortion conspiracy because, even after viewing the evidence in favor of the government, a reasonable jury could not find that Campbell himself promoted the conspiracy and had a stake in its outcome. See United States v. Zambrano, 776 F.2d 1091, 1094 (2d Cir.1985); see also Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949) (to aid or abet another to commit a crime defendant must associate himself with the venture, participate in it, seek to bring it about and make it succeed). The government also relies upon testimony that Campbell expressed distaste for Department inspectors who were not willing upon being paid to overlook violations. But this testimony does not demonstrate his participation in the Department's extortionate scheme, it simply indicates his culpability as a "briber." See Capo, 817 F.2d at 954.
 
 
 40
 The government points to our recent holding in United States v. Stolfi, 889 F.2d 378 (2d Cir.1989) and the Fourth Circuit's holding in United States v. Spitler, 800 F.2d 1267 (4th Cir.1986) as further support for its position. Both of those decisions are distinguishable. In Stolfi appellants were found guilty of aiding and abetting extortion under fear of economic loss where they negotiated a payoff of $100,000 by Wedtech to Local 17 of the Brotherhood of Carpenters and Joiners (carpenters' local) so that the carpenters' local would cease threatening work stoppages and violence against Wedtech. In holding appellants guilty for aiding and abetting the carpenters' local in their extortionate conduct we noted that the evidence was sufficient to establish that "appellants 'associated themselves' with the carpenters' criminal venture, participated in it as something that they wished to bring about, or sought by their action to make it succeed." 889 F.2d at 381. We held, in addition, that appellants aided and abetted the extortion through their use of the carpenters' local's threat of a work stoppage or violence to negotiate the payment of $100,000. Id. In the case at bar the government alleges that Campbell aided and abetted extortion under color of official right, but it produced no evidence that Campbell ever told the victims of the scheme that he had authority from the City Health Department to collect payments from his clients on behalf of the Department.
 
 
 41
 In Spitler it was held that a company vice president was guilty of aiding and abetting extortion under color of official right when he engaged in a scheme under which he authorized company employees to supply a corrupt government official with items of value in exchange for the official's approval of inflated and fraudulent invoices billing the State of Maryland. Contrary to the facts in Spitler, see 800 F.2d at 1278, Campbell did not initiate a "symbiotic relationship" between the victims--his client restaurants--and the corrupt government officials. Rather, this relationship was initiated by the Department defendants who apparently extorted money from Campbell, as well as from other consultants, and from restauranteurs directly. There is no proof that the Department ever referred a single restaurant to Campbell for him to facilitate their extortionate scheme. In Spitler the court admonished that its holding be limited to the facts of that case because reading it as a "rule of general applicability might criminalize under the Hobbs Act conduct which ... may ... be conduct of a victim succumbing to a climate of unstated prerequisites to doing business with particular public officials or departments." Id. at 1278 n. 6. Campbell fits precisely into this situation.
 
 
 42
 As a consequence, his Hobbs Act convictions must be reversed. Since a required element of Campbell's convictions under RICO was his commission of two or more predicate violations of the Hobbs Act, those convictions must also fall. See 18 U.S.C. Secs. 1961(1) & (5) (1988).
 
 B. Brady Violation
 
 43
 Appellant Bower contends that the government breached its prosecutorial duty under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to reveal that its lead witness, Moe Tillem, was receiving psychiatric counselling during the course of the trial. This argument is without merit. After a hearing on this issue the district court found that the prosecution was not aware that Tillem was receiving treatment. United States v. Bower, No. 88 CR 219 (S-2), slip op. at 3 (E.D.N.Y. July 18, 1989); see Morgan v. Salamack, 735 F.2d 354, 358 (2d Cir.1984) (government is not required to disclose evidence it does not possess or of which it is not aware).
 
 II. ERRORS IN THE CONDUCT OF THE TRIAL
 A. RICO Charge
 
 44
 Appellants Bower, Simms, Overton, Larrier and Campbell contend that it was error for the trial court to charge the jury that they could find a violation of RICO so long as they found that defendants "committed two of the alleged extortions in furtherance of the enterprise." The charge tracked our holding in United States v. Ianniello, 808 F.2d 184, 190-91 (2d Cir.1986), cert. denied, 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987), that the concepts of relatedness and continuity essential to a "pattern of racketeering activity" are supplied by the enterprise requirement in 18 U.S.C. Sec. 1962(c) (1988). Id. at 190-91.
 
 
 45
 Subsequent to this instruction--but prior to the present appeal--in overruling Ianniello we held that
 
 
 46
 proof of two acts of racketeering activity without more does not suffice to establish a RICO pattern; that the concepts of relatedness and continuity are attributes of activity, not of a RICO enterprise, and that a RICO pattern may not be established without some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity....
 
 
 47
 United States v. Indelicato, 865 F.2d 1370, 1381 (2d Cir.) (en banc ), cert. denied, --- U.S. ----, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). The Supreme Court adopted the stringent requirements of Indelicato, see H.J. Inc. v. Northwestern Bell Telephone Co., --- U.S. ----, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989), and subsequent jury instructions followed this path, cf. United States v. Kaplan, 886 F.2d 536, 543 n. 1 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990) (jury charge indicating that "a pattern of racketeering activity exists where a person commits at least two criminal acts ... and commits those acts, not as separate and disconnected offenses, but as part of a larger pattern of activity connected with that person's participation in the conduct of the affairs of the enterprise").
 
 
 48
 Appellants contend that the trial court's failure to instruct the jury that a RICO violation could only be found if the defendants committed two or more Hobbs Act violations that were interrelated and continuous mandates reversal. We disagree. Reversal is not warranted because the failure to charge on the requirements of relatedness and continuity did not amount in this case to plain error. See Fed.R.Crim.P. 52(b).
 
 
 49
 If the action taken or not taken by the trial court is objected to at the time and later held on appeal to have been prejudicial to defendant, it is termed "reversible error." In the case at hand no objection was taken to the charge that would have given the trial court an opportunity to remedy it. Hence, we may reverse only for a "plain error", that is, an error so fundamental that we must grant a new trial. 3A C. Wright, Federal Practice and Procedure: Criminal 2d Sec. 851 (1982). Plain error is defined as an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object. The plain error doctrine is used sparingly when necessary to redress a miscarriage of justice. See United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); United States v. Frady, 456 U.S. 152, 163, & n. 13, 102 S.Ct. 1584, 1592, & n. 13, 71 L.Ed.2d 816 (1982); Wiborg v. United States, 163 U.S. 632, 658, 16 S.Ct. 1127, 1137, 41 L.Ed. 289 (1896) ("[A]lthough [a] question was not properly raised, ... if a plain error was committed in a manner so absolutely vital to defendants, we feel ourselves at liberty to correct it.").
 
 
 50
 Plain error analysis is appropriate here because the trial court made its proposed jury instructions available to all parties prior to charging the jury. Appellants took no objection to the charge's failure to require that the predicate acts be interrelated and continuous. Fed.R.Crim.P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.")
 
 
 51
 Further, the court's jury instruction did not prejudice appellants because the proof overwhelmingly established that the predicate Hobbs Act violations were interrelated and continuous. The government demonstrated the interrelationship of the predicate extortions by showing that they all sought a "common goal," Kaplan, 886 F.2d at 542--the receipt of free money or services in exchange for the Department defendants giving restaurants a passing test score after inspecting them. See United States v. Gelb, 881 F.2d 1155, 1163 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989). The testimony also conclusively established that appellants sought to extort money from restauranteurs whom they had previously dealt with and engaged in extortionate conduct over a two-year period, evidencing that the extortionate activities were continuous or posed a threat of being continuous. See Kaplan, 886 F.2d at 542-43; Gelb, 881 F.2d at 1163-64. Consequently, because the government amply demonstrated appellants' extortionate conduct was both interrelated and continuous beyond a reasonable doubt, any error resulting from the deficient instructions did not affect the fundamental fairness of the trial.
 
 
 52
 Appellants argue that application of the plain error rule is inappropriate based upon the doctrine of retroactivity articulated in Ingber v. Enzor, 841 F.2d 450 (2d Cir.1988). In Ingber we applied substantive changes in well-settled rules of criminal law retroactively, notwithstanding that challenges to those rules were first made on appeal. Id. at 454. Appellants therefore argue that Ingber establishes an exception to the contemporaneous objection requirement where a substantive rule of criminal law has been changed.
 
 
 53
 In United States v. Musacchia, 900 F.2d 493, 501-02 (2d Cir.1990), we declined to make such an exception where there is insufficient established Circuit authority to make such an objection futile. Id. at 502. Here, as in Musacchia, there was no well-settled Circuit rule, instead our decisions in this area of the law were far from consistent. See Indelicato, 865 F.2d at 1377-80. Thus, the present case is distinguishable from Ingber where counsel was faced with Circuit law that made raising the claim of error at trial appear futile. Ingber, 841 F.2d at 454. Here, defense counsel failed to make the requisite objection to the jury instructions. As a consequence, we conclude that the trial court's charge--though doubtless reversible error had it been objected to at trial--was not so obvious and substantial an error as to effect the integrity of the trial process and mandate a reversal as plain error under Rule 52(b).
 
 B. Supplemental Charge
 
 54
 Appellants Bower, Simms and Overton further contend that the supplemental instructions were also in error because they did not adequately respond to the jury's inquiry on the distinction between extortion and bribery. They also argue the trial court improperly responded to a jury inquiry without soliciting input from defense counsel.
 
 
 55
 The first supplemental instruction was given early on the first day of jury deliberations when the jury sent a note asking for inter alia "[t]he definition of extortion as it pertains to this case." The trial court indicated that it intended to reread the portion of the charge relating to extortion. Appellants' counsel did not object. As the district judge began to provide the jury with the definition of extortion, a juror interrupted and asked the court to explain the difference between extortion and bribery. The judge responded
 
 
 56
 Extortion requires the use of fear, the installation of fear. And then the person from whom the property is extorted gives consent to give the property to the person who extorts him through the use of fear.
 
 
 57
 Now, bribery, without looking at the statute, bribery is in a different category. There is no fear used, as I understand it. In that case, someone induces the defendant--the defendant induces the giving of property through a violation of trust or violation of the law or statute. No fear is used.
 
 
 58
 The second supplemental charge was given after the jury sent a second note indicating that
 
 
 59
 a few members of the jury have a basic question regarding the law. The question is, is it mandatory that Department of Health employees ... ask for or demand or gesture for property[ ] in order that the charge of extortion can be considered[?] [I]f a public official accepts money ... without asking for it, is this exploitation or extortion?
 
 
 60
 The court stated that it intended to reread the initial instruction on extortion, and defense counsel requested time to "discuss it amongst [them]selves." Again, counsel made no objection to what was proposed, and the trial judge proceeded to reread pertinent portions of the initial charge.
 
 
 61
 The jury retired and sent a third note requesting that a portion of the charge regarding extortion be reread. Defense counsel for appellant Simms argued to the trial court that ample opportunity had not been afforded counsel to discuss amongst themselves a response to the second note, and that counsel now objected to the court's response to the second note. He argued that the court should have responded to the question, "[i]f a public official accepts [money] without asking for a bribe, is that extortion?" with the answer "no." After hearing this argument, the district court reacted to the third note by rereading relevant portions of its prior instruction on the law of extortion.
 
 
 62
 The district judge's supplemental instructions do not warrant reversal. Appellants objected to the supplemental instructions only after failing to object to the court's initial charge on extortion and how it differs from bribery. They failed to make timely objection to the supplemental instructions. Defense counsel's objection--criticizing the court's response to the question posed in the jury's second note--was also made only after the trial judge had already answered the second note and the jury had retired. It was therefore untimely.
 
 
 63
 When an objection is untimely made, reversal is proper only when there is plain error. See Fed.R.Cr.P. 30; see also United States v. Gengo, 808 F.2d 1, 4 (2d Cir.1986). The legal sufficiency of supplemental instructions is assessed in light of the jury instructions as a whole. Id. at 4. The district judge reread the initial jury charge that accurately depicted the difference between bribery and extortion in response to the jury's questions. Any inaccuracy in the attempt to provide an "offhand" distinction between bribery and extortion in response to the juror's oral question after the first note, or any confusion caused by the trial court's failure to answer directly the jury's question in the second note was remedied by "a rereading of the full charge ... which correctly set forth the applicable principles." United States v. Williams, 705 F.2d 603, 618-19 (2d Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). Hence, the supplemental instructions were sufficiently "responsive to the jury's request," see United States v. Viserto, 596 F.2d 531, 539 (2d Cir.), cert. denied, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).
 
 
 64
 Appellants further assert that the trial court improperly responded to the juror's oral question without first soliciting the views of defense counsel. They argue that the court failed to abide by the four-step procedure outlined in United States v. Ronder, 639 F.2d 931 (2d Cir.1981): first, requiring a juror's question to be submitted in writing; second, marking the note as a court exhibit and reading it into the record; third, affording defense counsel an opportunity to respond; and fourth, reading the note to the jury upon their recall. Id. at 934.
 
 
 65
 Although this is the preferred procedure, we are "[m]indful that trial judges must be permitted some latitude in determining how best to handle jury inquiries [and] we have accepted substantial compliance with the Ronder procedure." United States v. Ulloa, 882 F.2d 41, 45 (2d Cir.1989). The district judge "was endeavoring to be helpful to the jury" and the juror was "seeking only slight clarification of [the] judge's [prior instruction, which could] be safely answered without requiring a further writing." Id. Thus, the trial judge's extemporaneous response to a juror's oral question was entirely appropriate.
 
 C. Severance
 
 66
 Appellant Bower argues that we should reverse his conviction for the district court's failure to sever his trial from that of the consultant defendants. This claim of improper joinder was waived by Bower's failure to make a motion for severance under Fed.R.Cr.P. 14 either before or during the trial. See, e.g., United States v. Goldberg, 527 F.2d 165, 173 (2d Cir.1975), cert. denied, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); United States v. Perl, 210 F.2d 457, 461-62 (2d Cir.1954). Even if appellant had not waived this issue, we are not persuaded that appellant suffered any prejudice by a joint trial. See United States v. Friedman, 854 F.2d 535, 563 (2d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).
 
 D. Limitation of Cross-Examination
 
 67
 Appellant Larrier challenges his conviction because the district court failed to allow him to cross-examine a government witness, Sam Witlow, on his alleged illegal engagement in structured transactions to avoid currency transaction reporting requirements. Appellant alleges that this contravened his Sixth Amendment right to confront prosecution witnesses. The trial court denied cross-examination on these prior bad acts after determining that they were not probative of his truthfulness within the meaning of Fed.R.Evid. 608(b). Cross-examination on these acts was also denied under Fed.R.Evid. 403--on the basis that the probative value of cross-examination on these acts was outweighed by their prejudicial effect. See Fed.R.Evid. 608 advisory committee's note to subdivision (b)(2) (indicating that Fed.R.Evid. 608(b) is subject to the restrictions of Fed.R.Evid. 403).
 
 
 68
 A district court's decision to restrict cross-examination may be reversed on appeal only in the rare instance where we think the trial court's broad discretion has been abused. See Fed.R.Evid. 608(b). The trial judge determined that the prior bad acts were analogous to crimes such as smuggling, and were not crimes probative on the issue of a witness's truthfulness. See 3 J. Weinstein & M. Berger, Weinstein's Evidence p 605 at 608-46 (1988 & Supp.1989). We see no abuse of discretion in this ruling.
 
 
 69
 We note further that even were we to believe that curtailing cross-examination on these acts was improper under Fed.R.Evid. 608(b), in determining whether reversal is mandated "the test is whether the jury was already in possession of sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." United States v. Singh, 628 F.2d 758, 763 (2d Cir.), cert. denied, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980). Defense counsel had ample opportunity to cross-examine Witlow on alleged "money skimming schemes," tax evasion, and a scheme to charge vendors "front money," that was more than sufficient to bring the issue of Witlow's credibility to the jury's attention. Thus, even if testimony of the currency transactions were admissible under Fed.R.Evid. 608(b), the limitation on cross-examination was not an abuse of the trial court's discretion.
 
 
 70
 E. Restrictions on Presentation of a Defense Theory
 
 
 71
 Larrier also asserts his convictions were improper because the trial court rejected his requested instructions to the jury and that the charge therefore failed to reflect the theory of his defense. Although jury instructions must indicate the defense theory of the case, United States v. Durham, 825 F.2d 716, 718 (2d Cir.1987), "appellant has the burden of showing that his requested charge accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced," United States v. Ouimette, 798 F.2d 47, 49 (2d Cir.1986), cert. denied, 488 U.S. 863, 109 S.Ct. 163, 102 L.Ed.2d 134 (1988). Larrier requested that the jury be instructed that
 
 
 72
 if you find that the payments were offered in exchange for a defendant's performing legitimate services or that the payments were offered for any purpose other than to affect the defendant's judgment as a public official, you must acquit that defendant.
 
 
 73
 Admittedly, the purpose of this request was to apprise the jury of Larrier's defense theory that he received payments from victims for legitimate services he performed outside of his employment by the Department. The requested instruction was legally incorrect because even if the jury found this theory credible, it would not be required to acquit Larrier since the government presented other evidence establishing Larrier's membership in the extortionate enterprise. In addition, the judge's charge accurately reflected the law, including the requirement that a Hobbs Act violation not be premised upon payments "due or owing the official," and did not prejudice Larrier's ability to present his defense theory. Hence, Larrier's contention is without merit.
 
 III. SENTENCING
 A. Overton's Sentencing
 
 74
 Appellant Overton claims he should be remanded for resentencing because the district court failed to reduce his offense level two points under the United States Sentencing Commission Guidelines Manual, Sec. 3E1.1 (1989). Section 3E1.1(a) provides for a two-point reduction "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." As appellant indicates, reduction under Sec. 3E1.1 is not precluded by the fact that he exercised his constitutional right to a trial. U.S.S.G. Sec. 3E1.1(b), at 3.21. But appellant showed no contrition at sentencing following his conviction by a jury, and asserted repeatedly "I never extorted any money." Thus, affording the district court's sentencing determination the "great deference" it is entitled to on appeal, see id. Sec. 3E1.1, comment (n. 5), at 3.22; see also United States v. Moskowitz, 883 F.2d 1142, 1155 (2d Cir.1989), the denial of a two-point reduction for acceptance of responsibility must be affirmed.
 
 B. Taynor's Sentencing
 
 75
 Appellant Taynor appeals solely from the court's sentencing determination under the Guidelines Manual. He argues that it was error for the district court to add six points under U.S.S.G. Sec. 2C1.1(b)(1) and Sec. 2F1.1(b)(1)(G), to add four points under U.S.S.G. Sec. 3B1.1(a), and to refuse to downwardly depart more than three months under U.S.S.G. Sec. 5H1.1 and Sec. 5H1.4. All of these arguments are without merit.
 
 
 76
 At sentencing the government need only prove disputed factual allegations by a preponderance of the evidence, see United States v. Guerra, 888 F.2d 247, 251 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990), and the factual findings of the district court may be reversed only when they are clearly erroneous, 18 U.S.C. Sec. 3742(e) (1988). The district court increased appellant's Guideline's level by six points after finding him accountable for extorting in excess of $100,001. The court held a three-day hearing pursuant to United States v. Fatico, 579 F.2d 707, 713 (2d Cir.1978), cert. denied, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980), to determine the amount of money for which appellant could be held accountable. Based upon the evidence at the hearing the court calculated that Taynor received at least $50 a week from each of three inspectors for the eight years of the conspiracy resulting in a total of $62,400. To determine the amount of extorted money of which Taynor was reasonably aware, see U.S.S.G. Sec. 1.B1.3, comment (n. 1), at 1.18 ("In the case of criminal activity undertaken in concert with others ... the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the [conspiracy] that was reasonably foreseeable by the defendant."), the court multiplied this figure by two because "inspectors generally shared with Taynor approximately half of the bribe money that they extorted from restaurants." United States v. Taynor, No. 88-CR-219-02, slip op. at 2 (E.D.N.Y. Apr. 5, 1989). Added to this figure were the sums of $3,500 and $1,000 that were given directly to Taynor by restauranteurs, bringing the total for which Taynor could be held accountable to $129,300. This figure was supported by Taynor's financial statement which evidenced a minimum of $481,000 of unexplained income. Hence, the sentencing court's finding is not clearly erroneous, and its addition of six points under Secs. 2C1.1(b)(1) and 2F1.1(b)(1)(G) (six point increase for range of $100,001-$200,000) of the Guidelines Manual was proper.
 
 
 77
 Taynor also contests the court's addition of four points for his role as "an organizer or leader of criminal activity." See U.S.S.G. Sec. 3B1.1(a), at 3.3. The determination of whether appellant was an "organizer or leader" also is a question of fact subject to the clearly erroneous standard established in 18 U.S.C. Sec. 3742(e). United States v. Lanese, 890 F.2d 1284, 1291 (2d Cir.1989), petition for cert. filed, No. 89-1459, 1990 WL 33574 (Mar. 19, 1990). This finding was fully supported by the evidence and justified the addition of four points under Sec. 3B1.1(a).
 
 
 78
 The failure to downwardly depart more than three months based upon Taynor's failing physical condition under U.S.S.G. Sec. 5H1.1 and Sec. 5H1.4--appellant's final argument for reversal--is not reviewable on appeal. See United States v. Colon, 884 F.2d 1550, 1552-56 (2d Cir.) (district court's decision on discretionary departure from the Guideline's range is not appealable by defendant), cert. denied, --- U.S. ----, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989).
 
 CONCLUSION
 
 79
 For the reasons stated, the convictions and sentences of appellants Bower, Simms, Overton, Larrier and Taynor are affirmed. Appellant Campbell's conviction is reversed and his indictment dismissed.